UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| T.J. | Court File No. 04CV2847ADM/RLE |
| Plaintiff, | |
| vs. | **DEFENDANTS KIDSPEACE MESABI ACADEMY'S AND KIDSPEACE CORPORATION'S STATEMENT OF THE CASE** |
| Mesabi Academy of KidsPeace, Inc., KidsPeace Corporation, and Michael Muehlberg, | |
| Defendants. | |

_____

**TO:** **Plaintiff, T.J., and her attorneys, Edward J. Matonich, David A. Arndt, and Julie A. Matonich, Matonich & Persson, 2031 Second Avenue East, P.O. Box 127, Hibbing, Minnesota 55746**

**Defendant, Michael Muehlberg, and his attorney, Elizabeth A. Storaasli, Agnew Dryer Storaasli Knutson & Pommerville, Ltd., 200 Sellwood Building, 202 West Superior Street, Duluth, Minnesota 55802**

Pursuant to paragraph 3 of the Court's September 21, 2004, Pretrial Notice and Order, Defendants KidsPeace Mesabi Academy, Inc., and KidsPeace Corporation file this Statement of the Case:

**Defendants Mesabi Academy's and KidsPeace's Concise Statement of the Facts of the Case and Listing of Particularized Facts that Support their Defenses:**

Defendants Mesabi Academy and KidsPeace anticipate that the evidence will demonstrate the following facts:

**I.   Mesabi Academy**

Mesabi Academy is located in Buhl, Minnesota. It provides correctional services for male youth, ages 12 to 18, pursuant to licensure by the Minnesota Department of Corrections. Mesabi Academy is a private, not-for-profit organization that provides residential care, educational and vocational training, and aftercare services. Mesabi Academy is a private membership non-profit corporation, of which the sole member is KidsPeace Corporation. KidsPeace Corporation is a private Pennsylvania non-profit corporation. Mesabi Academy is in good standing with the Department of Corrections. Additionally, Mesabi Academy recently passed a peer review and was acknowledged by the Minnesota Council of Child Caring Agencies

as a facility that adheres to the Council's standards for the treatment of children in residential placement.

## II.     Summary Profile of Youth Who Reside at Mesabi Academy

All the youth for whom Mesabi Academy provides correctional services have been convicted of a felony or misdemeanor, or are chronic offenders. Many of these residents are in Mesabi Academy's correctional program because of convictions for violent or other aggressive behavior. Offenses for which residents have been convicted include murder, rape, and sexual assault. Mesabi Academy provides services and treatment designed to help residents manage and take responsibility for their own behavior, advance their competencies, make restitution to their victims, and plan for their return to their home and community.

While at Mesabi Academy, many residents frequently engage in inappropriate and offensive behavior directed at staff and other residents. Beyond inappropriate behavior, it is not uncommon for residents to engage in violent or aggressive behavior. All Mesabi Academy employees receive extensive training to enable them to deal with, deter, and respond to this type of behavior. As part of their qualifications, all Mesabi Academy employees must be certified to perform Professional Crisis Management ("PCM"), which is a comprehensive system designed to manage aggression, violence, and other crisis situations effectively, safely, and with dignity. Mesabi Academy has extensive safety and security protocols, which are required to be followed by its staff.

## III.    Sex Offenders at Mesabi Academy

Many residents have been placed at Mesabi Academy because they have committed sex-related offenses. These residents have correctional plans that include sex-offender treatment, and are placed on units in which all residents are undergoing sex-offender treatment. It is not uncommon for residents on these units to engage in sexually inappropriate and/or explicit behavior, which often results from their inability to deal with sexual feelings in an appropriate manner. Oftentimes, sex offenders' sexually inappropriate and/or explicit behavior is directed at Mesabi Academy staff.

## IV.    Department of Corrections Rules Regarding Staffing Ratios and Assignments

Pursuant to Minnesota Department of Corrections regulation, which is subpart 7 of section 2955.0080 of the Minnesota Administrative Code:  "The number of work hours performed by the sex offender treatment staff may be averaged weekly and combined in different ways, depending on program needs, to achieve a minimum ratio of one full-time equivalent position for each ten clients in the primary phases of treatment and one full-time equivalent position for each 20 clients in the transition and reentry phases of treatment."

Pursuant to Minnesota Department of Corrections regulation, which is subpart 5 of section 2935.0600 of the Minnesota Administrative Code, staff members at juvenile residential facilities may be placed in positions of responsibility for the supervision and welfare of residents of the opposite sex except in circumstances that can be described as invasion of privacy, degrading, or humiliating to the resident.

Pursuant to Minnesota Department of Corrections regulation, which is subpart 6 of section 2935.0600 of the Minnesota Administrative Code, juvenile residential facility staff of one sex may be used as program resources with residents of the opposite sex so long as staff of the residents' same sex is on duty, awake and alert in the facility.

Pursuant to a contract with the State of Washington, Mesabi Academy provides a 1:1 staffing ratio for N.S.

## V.     T.J.'s Employment Working with Sex Offenders

### A.     T.J.'s Position as a Youth Care Worker on the Discovery Unit

T.J. was hired as a Youth Care Worker on April 2, 2002.  A Youth Care Worker provides physical coverage, guidance, and direction to residents, and participates in the development and implementation of individualized treatment plans and unit programs to meet residents' special needs.  Youth Care Workers must demonstrate a variety of counseling and parenting-type skills in an effort to form trusting, supportive, and respectful relationships with residents.  Youth Care Workers also play a critical role in maintaining a safe and secure environment at Mesabi Academy.

Throughout her employment at Mesabi Academy, T.J. has been assigned to the Discovery Unit.  The Discovery Unit houses exclusively residents who are receiving sex-offender treatment and have been convicted of sex offenses.  In addition to the Youth Care Worker responsibilities described in the preceding paragraph, Youth Care Workers on sex-offender units must work with residents to help them develop positive and healthy ways of thinking and acting in relation to their sexual feelings.  When a resident acts out inappropriately, whether in a sexual, violent, or other manner, the assigned Youth Care Worker is responsible for holding the resident accountable for his behavior, and for issuing sanctions appropriate to the resident's individualized treatment plan.  Supervisors and counselors also help in issuing sanctions.  T.J. participated in Sex-Offender Training in January, 2003.

Throughout her employment, T.J. has been assigned as a Youth Care Worker on the Discovery Unit, under the direct supervision of Paul Jacobson.  Mr. Jacobson is the Unit Supervisor for the Discovery Unit.  Mr. Jacobson is supervised by Lance Edminster, the Program Manager.

### B.     T.J.'s Get Acquainted Period, Performance Evaluations, and Wage Increases

Employees at Mesabi Academy are considered to be in a "Get Acquainted Period" ("GAP") for at least the first six months of their employment.  During their GAP, employees must complete all corporate core mandated training requirements, and have a complete personnel file.  The GAP is also designed to assess the competency of job performance, and then determine whether further employment is warranted.  An employee's GAP may be extended if she has not, within the first six months, completed all required training, ensured completion of her personnel file, and/or failed to demonstrate satisfactory job performance at the discretion of Mesabi Academy.  Employees are ordinarily eligible for a wage increase upon completion of their GAP, but not before that time.

T.J.'s initial GAP ran from April 2 through October 8, 2002. In mid-October, 2002, Mr. Jacobson presented a written performance evaluation to T.J.. In the evaluation, Mr. Jacobson informed T.J. that she needed to demonstrate improvement in several performance areas: child/adolescent care methods and interventions; program policies and procedures/mission; counseling; promoting teamwork and respect to achieve inter and intradepartmental cohesiveness; communicating clearly and concisely in both written and oral fashion; upholding the professional standards of treatment and the mission of KidsPeace in imparting services; adhering to KidsPeace policies and procedures; and attending all required orientation, inservices, and staff meetings, attending pertinent continuing education offerings, training, seminars, and/or lectures to maintain certification. As a result of these deficiencies, T.J. received an overall performance rating of "Needs Improvement." Mesabi Academy presented T.J. with an improvement plan, and extended her GAP for three months. Because she did not complete her GAP in October, 2002, T.J. was not eligible for and did not receive a wage increase at that time.

On January 8, 2003, T.J. was allowed to complete her GAP. At that time, she also received a 3% wage increase. In October, 2003, while on her current leave of absence, T.J. was presented with another performance evaluation. In this evaluation, Mr. Jacobson gave T.J. an overall performance rating of "Meets Expectations." T.J. was also given another wage increase, with an effective date of September 7, 2003.

### C. T.J.'s Frequent Interactions with N.S.

One of the residents with whom T.J. has had significant interactions on the Discovery Unit is N.S. N.S. has very frequently demonstrated a wide range of inappropriate, unhealthy, and volatile behaviors. He has demonstrated these behaviors while interacting with many different staff members, including T.J.. These behaviors have included, but not been limited to, threatening to physically injure or kill staff; physically injuring staff; threatening to physically injure or kill himself; physically injuring himself; refusing to follow staff directives; poor hygiene; refusing to observe appropriate boundaries when interacting with staff; staring at female staff's faces and breasts; disrupting group counseling sessions; making inappropriate sexual comments about staff; masturbating within the view of staff; and exposing himself to staff.

N.S. has been subjected to a variety of sanctions for his inappropriate, unhealthy, and volatile behaviors. These sanctions have included, but not been limited to, instructions to redirect his behavior; loss of privileges; confinement to his room on the Discovery Unit; and segregation in Mesabi Academy's Secure Unit. When necessary, staff have administered physical restraints to N.S. These physical restraints are ordinarily administered by teams of two or three staff, and are intended to stop and deescalate aggression and crises, and to prevent injury to N.S. and others. Through treatment and consistent communications regarding expectations, the frequency of N.S.'s inappropriate, unhealthy, and volatile behaviors has decreased.

T.J. and many other Youth Care Workers have documented inappropriate, unhealthy, and volatile behaviors demonstrated by N.S., and the resulting sanctions to which N.S. has been subjected. Lesser misbehavior (and positive behavior) is documented in Daily Activity Logs, and more serious misconduct is documented in Client Incident Reports. Each Client Incident Report records the misconduct, provides an assessment of N.S.'s behavior, and sets forth a plan

for addressing and improving N.S.'s behavior. Each Client Incident Report is reviewed and approved by the Unit Supervisor.

For example, on November 25, 2002, Youth Care Worker Misty Thronson completed a Client Incident Report recording that she observed N.S. masturbating in his room, and then observed N.S. intentionally expose himself to her. After Ms. Thronson called for assistance, another staff member removed N.S. from the unit and placed him in a time-out room. The Report states that the follow-up plan called for staff to continue to intervene with N.S. attempting to identify N.S.'s offense cycle, and a report to N.S.'s counselor so that appropriate interventions could be developed. The plan also called for staff to hold N.S. accountable by utilizing Mesabi Academy's Model of Care and PCM restraint techniques; assist N.S. through individual and group counseling sessions; and give him the skills and confidence needed to identify and overcome the stages of his offense cycle.

Mesabi Academy reported to local law enforcement that N.S. had exposed himself to Ms. Thronson. Consequently, N.S. was charged with criminal behavior and required to appear in court.

On December 11, 2002, T.J. completed a Client Incident Report recording that N.S. had walked behind her in the cafeteria and rubbed her back and hair with his arm and hand. The Report states that the follow-up plan called for N.S. to be confined to his room for the rest of the night, pursuant to the instructions of David Adams, who was then the Lead Residential Supervisor. The plan also called for staff to continue to work with N.S. on these behaviors, to encourage him to use his interventions to alter his behavior, and to use the Mesabi Academy Model of Care to empower N.S. into making the right choices and to have self-confidence.

On February 8, 2003, T.J. completed a Client Incident Report recording N.S.'s refusal to follow her directives and attempts to intimidate female staff. The Report explains that other staff assisted T.J. in physically restraining N.S. The Report states that the follow-up plan called for a variety of actions, including staff monitoring for verbal and physical cues that N.S. displays to anticipate escalation of his violent behaviors that he has displayed in the past; staff encouraging N.S. to utilize interventions to alter his behavior and to discuss the situation with staff; and staff use of the Mesabi Academy Model of Care to empower N.S. to recognize his behavioral cues, modify his negative behaviors and feelings, and emphasize his personal strengths.

On March 18, 2003, T.J. completed a Client Incident Report recording N.S.'s ongoing disrespect toward staff throughout that afternoon, T.J.'s warnings to N.S. regarding his behavior, an escalation in N.S.'s behavior, and implementation of the CABC Plan discussed below. The Report states that, while staff was assisting N.S. as he stood up from a PCM mat, N.S. began to struggle and kicked T.J. in the leg. The Report states that staff then placed N.S. in a physical restraint and escorted him to a time-out room. The Report states that, as a sanction for his conduct, N.S. was placed in disciplinary segregation in the Secure Unit for 120 hours. Finally, the Report describes a follow-up plan.

On April 1, 2003, T.J. completed a Client Incident Report recording N.S.'s refusal to follow her directives, disrespectful behavior, and attempts to intimidate female staff. The Report states that, when the initial physical restraints did not succeed in de-escalation, the supervisor,

Clayton Koskela, authorized placing N.S. in a security belt and cuffs. While in a belt and cuffs, N.S. continued to threaten to physically harm T.J.. The Report explains that N.S. was placed in disciplinary segregation in Mesabi Academy's Secure Unit. The Report also contains a follow-up plan.

On April 17, 2003, T.J. completed a Client Incident Report, which stated that she had discovered notes in N.S.'s room, in which N.S. had written inappropriate comments about having sex with staff. After T.J. conferred with the supervisor, Mr. Koskela, and N.S.'s counselor, Walter McElderry, N.S. was sent to disciplinary segregation in the Secure Unit. The Report also contains a follow-up plan.

The examples described above are just a few of many documented incidents involving N.S.

N.S.'s behavior and misconduct have also been addressed in individual and group counseling sessions. And Mesabi Academy's clinical staff prepared a "CABC Plan" for N.S. CABC stands for Context/Antecedents/Behavior/Consequences. The CABC Plan instructs staff that, when N.S. engages in stalking behavior toward his female Youth Care Workers, he is to be warned once and, if the behavior continues, he is to be immediately placed on a PCM mat in either a two-person or three-person physical restraint, followed by isolation in his room for a period of time to be determined by the targeted female staff person. The CABC Plan provides further that, if N.S. resists, he may be placed in mechanical restraints. The CABC Plan explains that stalking behavior includes overt staring, sexual comments, sexual writings, intimidation by body language or oral statements, and physical contact. This CABC Plan is to be instituted each time that N.S. engages in stalking behavior, and remains in effect until he has abstained from such behavior for a period of two weeks.

### D.     T.J.'s Interactions with D.C. on June 28, 2003

Criminal charges have been filed against resident, D.C., as the result of his alleged sexual assault of T.J. on June 28, 2003. D.C. was a sex offender assigned to the Discovery Unit. During Mesabi Academy's investigation of the incident, witnesses reported the following: (1) the afternoon of June 28, 2003, T.J., in violation of Mesabi Academy policy, participated in a water fight with D.C. and N.S., during which T.J. threw water over a shower door while N.S. was showering; (2) later that afternoon, D.C. asked Youth Care Worker Deanna Maki to bring him to the personals area to retrieve some personal property; (3) when Ms. Maki refused D.C.'s request, T.J. volunteered to bring D.C. to the personals area; (4) visits to the personals area ordinarily occurred on a weekly basis on a day designated for visits accompanied by Pat Lenzen; (5) at approximately 2:45 p.m., during a staff shift change, T.J. transported D.C. to the remote and unmonitored personals area one floor above the Discovery Unit; (6) in violation of Mesabi Academy policy and procedure, T.J. did not call to Central Control/Security to request permission to transport D.C. to the personals area; (7) in violation of Mesabi Academy policy and procedure, T.J. did not have a radio/walkie-talkie with her while transporting D.C. to the personals area; (8) T.J. reported that, in the personals area, D.C. placed his hand on T.J.'s throat and said he would kill her; (9) T. J. reported that she then blacked out and, when she awoke, she was unclothed from the waist down, and D.C. was on top of and inside her; (10) at

approximately 2:55 p.m., T.J. appeared with D.C. on the Discovery Unit and reported that she had been raped by D.C.; and (11) D.C. admitted to having sexual intercourse with T.J.

T.J. was informed of, and was responsible for knowing about, D.C.'s violent criminal background well before June 28, 2003.

The afternoon of June 28, 2003, T.J. began an approved leave of absence. She remains employed and on a leave of absence.

### E. The Absence of Complaints of Discrimination, Harassment, or Retaliation

T.J. did not, at any time preceding the filing of a discrimination charge with the EEOC on November 19, 2003, report to Mesabi Academy any alleged discrimination, harassment, hostile working environment, or retaliation.

As stated in its Policy HR.2.1.03, concerning Harassment, Mesabi Academy prohibits all forms of sexual harassment, sex discrimination, and retaliation. The policy states clearly: "Individuals who believe that they have been the victim of [discrimination, harassment, or retaliation] should discuss their concerns with their supervisor, the Director of Human Resources, Assistant Director of Human Resources or Manager of Human Resources." The policy also states that employees are encouraged "to report any harassing conduct before it escalates and becomes severe or pervasive."

Having reviewed Mesabi Academy's Policy and Procedure Manual, and having participated in new employee orientation and training, T.J. was aware of this Harassment policy. She did not, however, make any report of alleged discrimination, sexual harassment, hostile working environment, or retaliation.

### F. T.J.'s Report Regarding a March 16, 2003, Incident in a Restroom

On March 16, 2003, T.J. reported via email that, while she was standing at a restroom sink, a male staff accompanied by a resident unlocked and opened the door to the restroom, the male staff told the resident to go use the restroom, and T.J. exited. The female restroom in question is across from the auditorium, and staff occasionally allowed residents to use this restroom for quick toilet breaks during family visits, religious gatherings, or entertainment events that occur in the auditorium. In her email, T.J. did not report any concerns about intentional sexual harassment, but instead emphasized her concerns that it was unsafe and unclean to allow residents to use the female restroom. Both before and after March 16, 2003, Mr. Edminster notified staff that they were not to let residents use this restroom. Following his receipt of T.J.'s email, Mr. Jacobson reminded Discovery Unit staff of this rule.

### G. T.J.'s Work Schedule and Accommodation of her Frequent Scheduling Requests

Both Mr. Jacobson and Mr. Adams have worked hard to accommodate T.J.'s requests regarding the shifts to which she has been assigned. Like all other Youth Care Workers, T.J. is assigned to work shifts according to the staffing needs of Mesabi Academy. Factors affecting her shift assignments include resident census, Department of Corrections staffing requirements,

safety concerns, availability of other Youth Care Workers, and T.J.'s scheduling and time-off requests.

Throughout T.J.'s employment, she has never had a fixed or permanent shift assignment for any particular day of the week. For weekday shifts, T.J. has ordinarily been assigned to work from 3-11 p.m., 1-11 p.m., or 5-11 p.m., but has also been assigned to work 1-9 p.m., 3-10 p.m., and 7 a.m. – 3 p.m. For weekend shifts, between April and mid-May, 2002, T.J. was ordinarily scheduled to work alternating 3-11 p.m. and 7 a.m. – 3 p.m. shifts. From mid-May, 2002, through February, 2003, T.J. was ordinarily scheduled to work 7 a.m. – 3 p.m. on Saturdays and Sundays. From March – May, 2003, T.J. was ordinarily scheduled to work 3-11 p.m. on Saturdays and Sundays, but was sometimes scheduled to work a weekend shift of 7 a.m. – 3 p.m. In June, 2003, before beginning her leave of absence, T.J. was ordinarily scheduled to work 7 a.m. – 3 p.m. on Saturdays and Sundays.

### H.   T.J.'s Interactions with Michael Muehlberg

Contrary to the allegations in paragraph 19 of T.J.'s Complaint, Mr. Muehlberg did not express an interest in her and did not extend an invitation to accompany him swimming.

Contrary to the allegations in paragraph 20 of T.J.'s Complaint, Mr. Muehlberg did not design a certificate that stated T.J. had received the Employee of the Month award because she had sex with a supervisor. Mr. Muehlberg did alter a computerized message to state that T.J. received the Employee of the Week award for wearing provocative clothing and sitting behind a desk. This message was a single line of text on the screen, was shown to two co-workers, and was not printed. T.J.'s concerns about this incident were discussed at a team meeting. In the meeting, Mr. Muehlberg explained that he had made no certificate, described the message he had created, and said it had been done as a joke. During this meeting, Mr. Muehlberg raised concerns about T.J.'s appearance and clothing, and whether it violated Mesabi Academy's Boundaries policy, Dress Code policy, or other policies. Similar concerns were raised by other employees and residents at other times.

In a team meeting a few weeks later, T.J. stated her belief that Mr. Muehlberg had sent an anonymous letter that was critical of T.J. Mr. Muehlberg did not write the letter, and Mesabi Academy never discovered its author. Nobody in the meeting, other than T.J., stated a belief that Mr. Muehlberg was the letter's author.

### I.   Mr. Muehlberg's Modification of Internal Company Website Photos

Before T.J. was hired, Mr. Muehlberg and several other employees used a cut-and-paste procedure to modify internal company website photos of some Discovery Unit staff. Modifications included adding hats and clothing, and placing the revised photos in a "Discovery Gallery." Discovery Unit employee, Susan Warren, complained to IS Support Supervisor, Greg Baughman, after Mr. Muehlberg presented Ms. Warren with an electronic photo in which Ms. Warren had been made to appear dressed in a cat-woman type of outfit. Mr. Muehlberg's supervisor, Mr. Jacobson, informed him that Ms. Warren was unhappy, and directed him to stop altering staff photos. Mr. Muehlberg did stop that activity. Additionally, Mr. Baughman modified the computer settings so that employees can no longer move or alter staff photos. Also,

at Mr. Baughman's suggestion, Mesabi Academy implemented a procedure in which employees may request that their photo be omitted from the website.

Mr. Muehlberg did not make the statements alleged by T.J. in paragraphs 28-29 of her Complaint.

### J.     T.J.'s Interactions with John Gustafson

Contrary to the allegation in paragraph 17 of her Complaint, T.J. did not report to anyone in management that Mr. Gustafson had choked a resident.

Contrary to the allegations in paragraphs 33-36 of T.J.'s Complaint, Mr. Gustafson did not engage in the alleged behavior, and T.J. did not complain about Mr. Gustafson's behavior.

### Defendants Mesabi Academy's and KidsPeace's Itemization and Explanation of any Claimed Damages:

Defendants Mesabi Academy and KidsPeace are not claiming any damages in this action.

Dated: October 13, 2004.                                        BRIGGS AND MORGAN, P.A.


By: s/Lee M. Friedman
       Daniel R. Wachtler (#113360)
       Lee M. Friedman (#276686)
2200 First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 808-6600

**ATTORNEYS FOR DEFENDANTS KIDSPEACE MESABI ACADEMY, INC., AND KIDSPEACE CORPORATION**